# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| MICHELLE M. GLOTH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:09-00056-CV-NKL |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## ORDER

Plaintiff Michelle M. Gloth ("Plaintiff") challenges the Social Security Commissioner's ("Commissioner") denial of her claim for Supplemental Security Income under the Social Security Act ("Act"), 42 U.S.C. §1381 *et seq*. On August 27, 2008, following an administrative hearing, an Administrative Law Judge ("ALJ") found that Plaintiff was not disabled. The decision of the ALJ stands as the final decision of the Commissioner. Plaintiff seeks judicial review, petitioning for reversal of the ALJ's decision and an award of benefits. The complete facts and arguments are presented in the parties' briefs and will be duplicated here only to the extent necessary. Because the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole, the Court denies Plaintiff's petition.

# I.     Factual Background[1]

In her application for SSI, Plaintiff alleged that she became disabled on May 6, 2004, when she was 18 years old. In her disability report, Plaintiff alleged disability due to chronic fatigue syndrome (CFS), borderline diabetes, metabolic syndrome, polycystic ovarian syndrome (PCOS), colitis, gastroenteritis, possible fibromyalgia, possible sleep apnea, and possible obsessive compulsive disorder. Plaintiff had a high school education and no past relevant work.

On December 6, 2006, Plaintiff visited Beth Rosemergey, D.O., to establish care. Plaintiff reported that doctors at Children's Mercy Hospital ("Children's") had diagnosed her with chronic fatigue syndrome, borderline diabetes, eosinophilic gastroenteritis, and metabolic syndrome. Although she had been prescribed numerous medications for her various ailments, Plaintiff stated that she was not currently taking any medications. Plaintiff stated that sh did not do regular exercise because of fatigue and aches. Plaintiff complained of fatigue, aches, intermittent swollen glands in her neck, and intermittent headaches. Dr. Rosemergey's examination of Plaintiff was normal except for mild tenderness in the right lower quadrant and skin conditions associated with obesity. Plaintiff's height was 64 inches, her weight was 241 pounds, and her blood pressure was 144/86. Dr. Rosemergey diagnosed Plaintiff with morbid obesity, metabolic syndrome, hypertension, amenorrhea, and suspected

---

[1] Portions of the parties' briefs are adopted without quotation designated.

2

PCOS. Dr. Rosemergey discussed with Plaintiff the importance of dietary modifications and getting formal exercise on a regular basis.

Plaintiff returned to Dr. Rosemergey three weeks later on December 27, 2006, and discussed a new concern of anxiety. Plaintiff stated she had no previous history of anxiety or depression and had never been on any medications to treat anxiety. Plaintiff was attending counseling with her grandmother and younger siblings, whom she helped to care for, and she felt like the counseling was going well. Plaintiff stated that she had problems falling asleep, but that, once she fell asleep, she stayed asleep. Dr. Rosemergey diagnosed anxiety with some depressive features and recommended Plaintiff continue the family counseling services and seek individual therapy as well. Dr. Rosemergey prescribed birth control pills for Plaintiff's amenorrhea, Metformin for her metabolic syndrome and PCOS, and Prozac and counseling for her anxiety.

Laboratory results indicated that Plaintiff's complete metabolic profile was normal. Plaintiff's blood pressure was 120/68; her weight was unchanged from her last visit. Dr. Rosemergey asked to see Plaintiff again in four weeks.

The next recorded visit was on March 5, 2007. Plaintiff's weight was 233 pounds, down 8 pounds from December 2006. Plaintiff's blood pressure was 160/100, so Dr. Rosemergey restarted her on blood pressure medication, which she had not taken for nearly a year. Based on Plaintiff's complaints of low back pain, Dr. Rosemergey gave her some back stretching exercises and prescribed Naprosyn, a muscle relaxant available over-the-counter. Dr. Rosemergey continued Plaintiff on Metformin and recommended she

eat five small meals a day to help with her episodes of nausea. Plaintiff reported a fair amount of anxiety and Dr. Rosemergey increased her Prozac dosage.

On April 11, 2007, Plaintiff returned to Dr. Rosemergey as instructed. Plaintiff told Dr. Rosemergey that she had applied for disability because she was too fatigued to work. Plaintiff reported that she had been to the bariatric clinic, but admitted that she had not been following the prescribed treatment. Plaintiff rejected Dr. Rosemergey's instructions to see a nutritionist. Plaintiff said she had stopped taking most of her prescribed medications because she felt nauseated, but that stopping the medications did not help her nausea. Plaintiff also noted that occasionally when she felt nauseated, her blood sugar had been very low. Dr. Rosemergey again recommended Plaintiff eat small, frequent meals to prevent a drop in blood sugar. Plaintiff's weight was 244 pounds, up 11 pounds from the month earlier. Plaintiff stated that she slept for 10 hours at night, took a 4-hour nap during the day, and still had daytime somnolence. Dr. Rosemergey scheduled Plaintiff for a sleep study and encouraged her to look into other options regarding her fatigue. No medical evidence of record indicates that Plaintiff returned to Dr. Rosemergey's care or to the bariatric clinic.

A June 1, 2007, state agency psychiatric review found that Plaintiff had non-severe mental impairments. The review report "check box" form states that Plaintiff has mild restrictions on daily living and maintaining social functioning, as well as maintaining concentration, persistence or pace; it states that Plaintiff has had no repeated episodes of decompensation of extended duration.

Case 4:09-cv-00056-NKL   Document 19   Filed 11/17/09   Page 4 of 24

On August 24, 2007, Paul Katzenstein, M.D., examined Plaintiff, at her request, for an opinion regarding fibromyalgia. She told Dr. Katzenstein that she did not have a primary care physician and that she was not taking any medications, except for birth control. Dr. Katzenstein noted Plaintiff's report that she had become sick in eighth grade, put herself through highschool by doing her lessons every day, and helped raise her younger brother and sister. Plaintiff complained of bad headaches, nausea, swelling in her lymph nodes, pain, and fatigue, despite getting a lot of sleep and taking one to two naps per day. Dr. Katzenstein's examination was normal, except for give-way weakness and a finding of 18/18 diffuse tender points. Plaintiff retained a full range of motion on all joints. Dr. Katzenstein's diagnoses included fibromyalgia and fatigue, with reported diabetes mellitus, reported PCOS, and reported metabolic syndrome. Dr. Katzenstein instructed Plaintiff to find a new primary care physician to prescribe the medications he suggested and implement a slowly graded fitness conditioning program. He specifically indicated that rheumatologic follow up was not required.

On December 17, 2007, Plaintiff met with Kelly Andra, M.D., to establish care. Plaintiff complained of chronic fatigue and pain from fibromyalgia and reported that she had been off her medications "for a while." Plaintiff said she stopped her medications because she had felt nauseated for more than one year, but her nausea did not improve when she stopped her medications. Plaintiff reported nausea, occasional abdominal pain, dark stools, joint pain, anxiety, and weight gain. Plaintiff told Dr. Andra that she applied for disability and asked to be restarted on her medications. Plaintiff's blood pressure was 124/66 and her

weight was 246 pounds.  Dr. Andra diagnosed: metabolic syndrome, PCOS, anxiety, hypertension, fibromyalgia, daytime sleepiness and headaches; and fatigue.  Dr. Andra prescribed medications for Plaintiff's metabolic syndrome, PCOS, anxiety, functional dyspepsia, hypertension, sleep difficulties, and fibromyalgia.  Dr. Andra referred Plaintiff for a sleep study and encouraged her to start swimming, stating she was "certainly deconditioned." (Tr. 162.)  Dr. Andra stated that Plaintiff should follow up in one month.

Three months later, on March 17, 2008, Plaintiff saw Mini Abraham, M.D., to whom she had been referred by Dr. Andra.  Dr. Abraham noted that Plaintiff had not been faithful in taking her prescribed medication and was not physically active.  Dr. Abraham stressed to Plaintiff the importance of taking her medication and making lifestyle changes to prevent or delay type two diabetes.  Plaintiff complained of weight gain, trouble losing weight, stomach disturbance and diarrhea, loss of bladder control, joint pain, esophageal reflux disease, amenorrhea, increased facial hair growth, and acne.   Dr. Abraham prescribed Glumetza, which in his opinion was usually tolerated better by patients than Metformin.

On April 10, 2008, Ann M. Romaker, M.D., and Michelle R. Merker, Ph.D., specialists in sleep-wake disorders, stated that the results of Plaintiff's sleep study showed mild obstructive sleep apnea.  Dr. Romaker and Dr. Merker reported that Plaintiff's description of her sleep pattern was a "fairly classic description of delayed sleep phase syndrome." (Tr. 184.)  The doctors recommended morning bright light therapy, melatonin, and weight loss, and either nasal CPAP, an oral appliance, or surgery.

6

On April 14, 2008, Plaintiff saw Dr. Andra again. Plaintiff had stopped taking most of her medications. Plaintiff had lost her samples and prescription for her anxiety medication, so Dr. Andra wrote another prescription for Cymbalta. Plaintiff had stopped taking Elavil for her sleep issues and fibromyalgia pain because "she remembered that she had been on it before and it had caused her to gain weight." Plaintiff's weight was 248 pounds. Plaintiff had not been taking her blood pressure medication because she lost the prescription. Plaintiff's blood pressure at this visit was 122/70 and Dr. Andra told Plaintiff she was doing fine off the blood pressure medication. Plaintiff stated that Glumetza was "working out much better" for her. Plaintiff complained of fibromyalgia pain and stated that she had tried swimming, but had quit. Plaintiff requested to be started on Lyrica, which Dr. Andra prescribed. Dr. Andra noted the results from the sleep study and recommended that Plaintiff follow the treatments outlined by Dr. Romaker.

On May 19, 2008, Plaintiff saw Dr. Abraham and indicated she was tolerating the Glumetza "without much of a problem." Dr. Abraham told Plaintiff to make lifestyle changes because of her "very high risk" of developing type two diabetes. Dr. Abraham instructed Plaintiff to add an over-the-counter omega-3 to help her mild dyslipidemia. Plaintiff had lost six pounds. Dr. Abraham assessed anxiety and depression, nausea, hypertension, fibromyalgia, amenorrhea, and metabolic syndrome with PCOS.

Also on May 19, 2008, Plaintiff saw Dr. Andra, who restarted her on blood pressure medication. Plaintiff complained of nausea approximately five times per week and Dr. Andra increased Plaintiff's Reglan to three times daily to treat her nausea. Dr. Andra

7

changed Plaintiff's anxiety medication, increased her Lyrica dose, and instructed her to continue Glumetza, on which she had experienced some weight loss. Plaintiff was instructed to follow up with the sleep clinic later in the week and to have laboratory testing repeated in six weeks. Plaintiff told Dr. Andra that Plaintiff did not feel like her fibromyalgia and depression medications were helping her.

Plaintiff returned to Dr. Romaker on May 23, 2008. Dr. Romaker described Plaintiff as "an unfortunate 22 year old young lady with multiple problems who complains of poor sleep that has been going on for eight years." (Tr. 182.) Plaintiff stated she typically slept from 4:00 a.m. until noon and then napped for two to seven hours during the day. Dr. Romaker stated that the sleep study indicated results "just at the upper limits of normal" and believed that the "obvious course" of treatment would be to lose weight, and doing so would likely resolve her REM related apnea. (Tr. 183.) Dr. Romaker prescribed a CPAP, a machine used to treat sleep apnea. Dr. Romaker stated that Plaintiff's delayed sleep phase and hypersomnia resulted in Plaintiff's body clock being "not quite in sync," which Dr. Romaker stated was "not necessarily a problem" because Plaintiff was "happy with her current schedule so it doesn't need to be altered." (Tr. 183.)

Plaintiff did not produce a Residual Functional Capacity ("RFC") assessment from any of her treating doctors.

### A. Plaintiff's Testimony

Plaintiff testified at her administrative hearing on August 4, 2008. Plaintiff was twenty-two years old and had a high school education. She testified that she had not tried

to perform any work since volunteer work when she was twelve or thirteen. She had no past relevant work and no vocational training.

Plaintiff stated that she had been sick since around 2001, when she was 15 years old, and described her illness as "a flu that just won't go away." Plaintiff stayed at home and completed high school through home study. She saw numerous doctors and underwent several tests without finding an answer for her ailments. Doctors at Children's eventually diagnosed her with chronic fatigue syndrome. Plaintiff stated she had been taking medication for her anxiety and depression for about one month, but that she had not noticed a change. Plaintiff also reported that she used her CPAP every night, but that it had not helped her apnea. Plaintiff said her days and nights were "way off" because of her delayed sleep syndrome.

She testified that several of her doctors had told her to exercise, and that she did not do so with regularity. She said that physical therapy hurt.

Plaintiff said she would typically go to bed around four a.m., wake up between noon and two o'clock, fix a meal, watch television, and check e-mail, then return to bed; she would awake again in the evening, fixing a meal and checking e-mail, then return to bed after showering. She said that recommended medications did not help her sleep during the night.

As to her functional abilities, Plaintiff reported that she could typically lift a jug of milk or groceries, stand or walk for ten minutes at a time, and sit for twenty to thirty minutes at a time. Plaintiff also experienced back and leg pain when bending and occasionally had to sit down after bending. She was able to climb steps with difficulty. Plaintiff said she

9

would go to the grocery store about once a week, occasionally run errands, do laundry, and care for her animals daily. She stated that her grandmother and boyfriend also do housework. Plaintiff testified that she did not drive because of her sleepiness and anxiety. She testified that she had lost nine pounds in the last two months and had gone to a nutrition class a week before the hearing.

Plaintiffs' grandmother completed a Third-party Adult Function Report concerning Plaintiff in April 2007. That report echoed Plaintiff's testimony concerning her daily activities and history.

### B.    Testimony of the Medical Expert

Richard Katzman, M.D., a medical expert, testified that Plaintiff's medical records reflected a diagnosis of metabolic syndrome, a combination of findings which included obesity, insulin resistance, hypertension, and mild sleep apnea. Dr. Katzman testified that Plaintiff also had PCOS, which he described as relatively common, not as necessarily causing fatigue, and potentially caused by medication Plaintiff had taken. Dr. Katzman commented that there was not much evidence supporting Plaintiff's claim of fibromyalgia and chronic fatigue. He stated insulin resistance often resulted in diabetes, and opined that Plaintiff's diabetes was controlled. He stated that Plaintiff's blood pressure was controlled with medication. He found that the record did not support a finding that Plaintiff was limited in bending, stooping, squatting, or climbing. Dr. Katzman opined that Plaintiff could stand, walk, or sit six to eight hours a day.

10

Dr. Katzman also noted that Plaintiff was deconditioned. He stated she would benefit from losing weight. Dr. Katzman stated that Plaintiff's sleep issues did not change his opinion.

### C. Vocational Expert Testimony

A vocational expert testified that a hypothetical claimant of Plaintiff's age, education, and work experience who could stand/sit six to eight hours per day and lift twenty pounds frequently could perform all levels of sedentary and light unskilled work. The vocational expert indicated that there are a significant number of such jobs in the local and national economies. The vocational expert said that an individual not able to work consistently with the general public could work jobs such as assembler, package sealer, housekeeper, and mail clerk which are also available in the local and national economies. The vocational expert stated that an individual who needed to lie down two to four hours during the day could not perform these jobs.

### D. The ALJ's Decision

The ALJ's decision follows the five step sequential evaluation for disability determination. At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity at any relevant time. At step two, the ALJ found that Plaintiff had the following "severe" impairments: metabolic syndrome (characterized by a combination of obesity, insulin resistance, and high blood pressure, including fatigue); diabetes, controlled; history of fibromyalgia and chronic fatigue syndrome, which was not well-documented in the medical evidence; polycystic ovarian syndrome; "mild" sleep apnea and delayed sleep

phase with "possible" hypersomnia; and depression/anxiety which is not severe. The ALJ noted that Plaintiff, though her attorney, had stated she was not contending that her condition meets or equals the criteria contained in the listing of impairments; the ALJ found that medical evidence did not support a finding that Plaintiff's impairments – "either singly or collectively" – met or equaled the listed impairments. (Tr. 13.)

The ALJ then discussed Dr. Katzman's testimony. She stated that Dr. Katzman opined that Plaintiff had no limitations on her functioning other than from her deconditioning.

The ALJ summarized Plaintiffs' medical records. The ALJ commented that the records show Plaintiff's weight remaining relatively constant during the prior two year, and that Plaintiff had refused to see a nutritionist in 2007 despite her treating doctor's recommendation, though she saw one a week before the hearing. The ALJ noted Plaintiff's testimony, and that Plaintiff appeared to sit without discomfort during the hour-long hearing. The ALJ commented that Plaintiff had been repeatedly told to exercise and lose weight, but admitted she does not do so. The ALJ also stated that Plaintiff had been told to try to adjust her sleep schedule, but had not done so even though her doctor told her she would not do another sleep study until Plaintiff adjusted the schedule. The ALJ also found that Plaintiff had never tried to work outside the home and had not sought any vocational training or further education. The ALJ found that Plaintiffs' allegations, including subjective complaints of pain, were not credible in light of the reports of treating and examining practitioners, as well as her activities of daily living including caring for her siblings, stopping medications, and the need for only mild, intermittent, or over-the-counter medication.

12

The ALJ indicated that the record did not contain the requisite medical signs and findings, established by medically acceptable diagnostic techniques, to show a medical impairment reasonably expected to produce Plaintiff's alleged pain and symptoms. There was no opinion in the medical evidence that Plaintiff was disabled mentally or physically.

The ALJ found that the objective medical evidence discussed by Dr. Katzman and the impairments and abilities he found were supported by the evidence. The ALJ also noted that the RFC submitted by the state agency physician allowing for light work was consistent with the RFC found by Dr. Katzman. The ALJ found Plaintiffs' physical RFC as follows: can sit/stand six hours in an eight-hour day; can lift twenty pounds occasionally and ten pounds frequently. The ALJ found Plaintiff's mental limitations to be: mildly limited in activities of daily living and social functioning, as well as in maintaining concentration, persistence or pace; no periods of decompensation of extended duration.

Based on this finding and the vocational expert's testimony, the ALJ determined that Plaintiff could perform jobs available in significant numbers in the economy. The ALJ concluded that Plaintiff was not disabled.

## II.    Discussion

Plaintiff argues that the ALJ erred (1) in not finding that the combination of her impairments (fibromyalgia, chronic fatigue, hypersomnolence, morbid obesity, depression and anxiety) equal a listed impairment, (2) in her credibility determination, (3) in her RFC determination, and (4) in her consideration of the vocational expert's testimony. To establish that she is entitled to benefits, Plaintiff must show that she was unable to engage in any

Case 4:09-cv-00056-NKL   Document 19   Filed 11/17/09   Page 13 of 24

substantial gainful activity by reason of a medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d) and § 1382c(a)(3)(A).

The Court must determine whether there was substantial evidence in the record to support the ALJ's finding that Plaintiff does not have a disability entitling her to benefits. *Dixon v. Barnhart*, 324 F.3d 997, 1000 (8th Cir. 2003). "Substantial evidence is relevant evidence that reasonable minds might accept as adequate to support the decision." *Id.* (citations omitted).

The Court will uphold a denial of benefits so long as the ALJ's decision falls within the available "zone of choice." *See Owen v. Astrue*, 551 F.3d 792, 798 (8th Cir.2008). "The decision of the ALJ is not outside the zone of choice simply because [a reviewing court] might have reached a different conclusion had [it] been the initial finder of fact." *Id.* (quotation omitted).

## A.    Meets or Equals a Listed Impairment

Plaintiff argues that the ALJ erred at steps two and three – in (a) not finding that her impairments were individually "severe" within the meaning of the regulations and (b) not finding that those impairments, in combination, medically equaled a listed impairment. At step two, ALJs must consider the effect of a claimant's alleged impairments, 20 C.F.R. § 416.920. If a medically severe impairment or combination of impairments is found at step two, ALJs must proceed to consider the medically severe combination of impairments

14

throughout the disability evaluation process, without regard to the independent severity of those impairments, *see* 20 C.F.R. § 416.923.

Here, the ALJ's decision indicates her finding that Plaintiff has the following "severe" impairments when considered in combination: metabolic syndrome (characterized by a combination of obesity, insulin resistance, and high blood pressure, including fatigue); diabetes, controlled; history of fibromyalgia and chronic fatigue syndrome, which was not well-documented in the medical evidence; polycystic ovarian syndrome; "mild" sleep apnea and delayed sleep phase with "possible" hypersomnia; and depression/anxiety which is not severe.

After making that finding, the ALJ continued with her analysis, determining that Plaintiff had not met her burden of showing that these impairments met or equaled a listed impairment. The ALJ expressly stated that this was the case considering the impairments "either singly or collectively." Because the ALJ found that the combination of Plaintiff's impairments was severe and proceeded with the sequential analysis to determine whether that combination met or equaled a listing, any error in not expressly finding Plaintiff's individual impairments severe was harmless.

Plaintiff waived the argument that her impairments meet or equal a listing. At the hearing, the ALJ asked Plaintiff's attorney, "Is your client contending her condition meets or medically equals any of the criteria contained in the listing of impairments?" (Tr. 197.) Plaintiff's attorney responded, "No, ma'am." (*Id.*) Plaintiff does not cite to any particular listing which she claims her condition meets or equals. *See Watson v. Barnhart*, 194 Fed.

Appx. 526, 529 (10th Cir. 2006) (finding no error where the claimant's counsel had conceded that the claimant was not arguing that her condition met or equaled a listed impairment: "recognizing that [the] claimant has invited the deficiency of which she complains") (citation omitted).

Even if Plaintiff did not waive the argument that the ALJ erred by not finding her impairments to equal a listing, the ALJ's finding is supported by the substantial weight of the evidence. *See Karlix v. Barnhart*, 457 F.3d 742, 746-47 (8th Cir. 2006) (finding that an ALJ's failure to elaborate on a finding that a claimant's impairments did not meet or equal a listed impairment was harmless where the evidence supported such a finding). Plaintiff bears the burden of proof in establishing that her impairments meet or equal a listing and she must show that her impairments meet the specified criteria via medical evidence. *See Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004).

In determining that Plaintiff's impairments did not meet or equal any such criteria, the ALJ considered that no treating or examining physician had mentioned findings equivalent in severity to the criteria of the listings, and that the medical expert at the hearing indicated that the record did not show such criteria. The ALJ also discussed Plaintiff's medical records concerning her impairments. Finally, the ALJ also considered Plaintiff's lawyer's statement that she was not contending she had a listed impairment. The ALJ's finding that Plaintiff had not met her burden of establishing that her condition met or equaled a listed impairment is supported by the substantial weight of the evidence.

### B. Credibility Determination

Case 4:09-cv-00056-NKL   Document 19   Filed 11/17/09   Page 16 of 24

Plaintiff argues that the ALJ improperly evaluated her credibility. Specifically, Plaintiff challenges the ALJ's finding that Plaintiff is not motivated to work, lose weight, exercise, or change her sleep schedule. Plaintiff argues that the ALJ should have considered the medical evidence that Plaintiff's impairments and medications limit her ability to work. She points specifically to her claims of fatigue, pain, nausea, and depression.

In evaluating the credibility of subjective complaints, the ALJ should consider objective medical evidence, but also "any evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001) (citation omitted). Other relevant factors include a Plaintiff's work history and the absence of objective medical evidence to support the allegations of disability. *Hutton v. Apfel*, 175 F.3d 651, 654-55 (8th Cir. 1999). The ALJ is not required to discuss each factor relevant to a credibility determination before discounting Plaintiff's subjective complaints so long as the ALJ acknowledged and considered those factors. *See Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (citing *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)). The primary question is not whether a claimant actually experiences the subjective complaints alleged, but whether those symptoms are credible to the extent that they prevent him from performing substantial gainful activity. *See McGinnis v. Chater*, 74 F.3d 873, 874 (8th Cir.1996) (citing *Benskin v. Bowen*, 830 F.2d 878, 882 (8th Cir.1987)). The evaluation of a claimant's credibility is primarily the task of the ALJ, not the reviewing court. *See Pearsall*, 274 F.3d at 1218 (citing *Benskin*, 830 F.2d at 882).

17

Though Plaintiff argues that the ALJ did not expressly consider any of the relevant factors, the ALJs decision demonstrates that she recognized those factors and provided a proper analysis. The ALJ stated the relevant factors. After reviewing the evidence of record, the ALJ determined that Plaintiff's allegations, "including subjective complaints of pain, are not credible in light of the reports of treating and examining practitioners, her daily activities including caring for her siblings, stopping medications, and the need for only mild, intermittent, or over the counter medication to control her symptoms." (Tr. 16.)

The ALJ noted the evidence in the record which was inconsistent with Plaintiff's claims of disability. The ALJ commented on Plaintiff's disregard of medical advice. Specifically, the ALJ pointed to the repeated medical advice that Plaintiff exercise and lose weight; the record shows that five different doctors told Plaintiff to increase her physical activity to alleviate her symptoms. The ALJ also noted that, except for Plaintiff's few attempts at water aerobics, Plaintiff had not followed that advice. *Choate v. Barnhart*, 457 F.3d 865, 870 (8th Cir. 2006) (indicating that an ALJ properly discounted a claimant's credibility where treating doctors did not restrict plaintiff's activities but, instead, directed him to engage in regular exercise). The ALJ also noted that Plaintiff failed to adjust her sleep schedule as instructed; Plaintiff reported to one of her doctors that she was "happy with her current schedule so it doesn't need to be altered." (Tr. 183). The record shows that Plaintiff failed to schedule various appointments as recommended by her doctors. *See Blakeman v. Astrue*, 509 F.3d 878, 883 (8th Cir. 2007) (holding that ALJ properly found subjective complaints of fatigue

18

inconsistent with objective medical evidence where physicians repeatedly advised the claimant to exercise and the claimant failed to schedule suggested medical appointments).

The ALJ properly noted that Plaintiff had not tried to work, and had not sought vocational counseling or further education. "A lack of work history may indicate a lack of motivation to work rather than a lack of ability." *See Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001).

The ALJ personally observed that Plaintiff's demeanor contradicted her claims. Though Plaintiff alleged she could sit for only minutes at a time, the ALJ observed that Plaintiff could sit without apparent difficulty through the entire hearing, which lasted for more than one hour. "The ALJ's personal observations of the claimant's demeanor during the hearing is completely proper in making credibility determinations." *Johnson v. Apfel*, 240 F.3d 1145, 1147-48 (8th Cir. 2001).

Plaintiff cites to an abundance of evidence reflecting her subjective complaints. But, as the ALJ noted, there is an absence of objective medical signs and findings indicating that Plaintiff suffered the severity of pain and symptoms she alleged. *See Hutton* , 175 F.3d at 655 (noting the relevance of an absence of evidence to credibility determinations). The ALJ stated that there is no opinion in the record demonstrating that Plaintiff is physically or mentally disabled. The fact that no functional restrictions were placed on Plaintiff is inconsistent with a claim of disability. *See Hensley v. Barnhart*, 352 F.3d 353, 357 (8th Cir. 2003).

The ALJ properly considered that a lack of strong pain medication is inconsistent with subjective complaints of disabling pain. *See Hall v. Chater*, 109 F.3d 1255, 1258 (8th Cir.

19

1997) (finding that a claimant's assertion of disability was inconsistent with an absence of using prescription pain medication). Plaintiff did not consistently take her medications and rarely took strong pain medication: the record indicates that Plaintiff took Naprosyn for her lower back pain that she thought was related to her menstrual period, took Elavil for a short time, and was prescribed Lyrica for her fibromyalgia. Plaintiff was often off all of her medications; other times, she simply "lost" or chose not to fill the prescription.

Plaintiff argues that the ALJ erred in evaluating her daily activities. However, the ALJ properly considered Plaintiff's activities as one factor under the credibility analysis. Plaintiff reported caring for her personal needs, doing household chores, including washing dishes and laundry, and taking care of her animals, preparing meals daily, shopping weekly, visiting with friends and family, climbing stairs, checking her e-mail, watching television and movies, and being sexually active with her boyfriend. Though a "claimant's ability to perform household chores does not necessarily prove that claimant capable of full-time employment," *Ekeland v. Bowen*, 899 F.2d 719,722 (8th Cir.1990) (citation omitted), Plaintiff's ability to engage in many normal daily living activities is a factor which may be considered as inconsistent with her allegations that she is completely unable to work. See 20 C.F.R. § 416.929; *Riggins v. Apfel*, 177 F.3d 689, 693 (8th Cir. 1999) (holding that activities such as driving his children and wife to school, shopping, visiting his mother, taking a break with his wife, watching television, and playing cards are inconsistent with claimant's complaints of disabling pain).

Plaintiff argues that the ALJ erred in not specifically mentioning the report from her grandmother. Plaintiff's grandmother completed a third party function report shortly after

Plaintiff filed her application for disability benefits; the report echoes Plaintiff's subjective complaints, activities of daily living, and history. The Eighth Circuit has held that implicit determinations of credibility are adequate when the ALJ's conclusion is supported by substantial evidence. *See Reynolds*, 82 F.3d 254, 258 (8th Cir. 1996). Such implicit determinations are appropriate where evaluation of third-party evidence may turn on the same evidence used to find a claimant not credible. *See Wilcockson v. Astrue*, 540 F.3d 878, 880 (8th Cir. 2008) (stating that remand is not required in circumstances where "third-party evidence supporting a claimant's complaints was the same as evidence that the ALJ rejected for reasons specified in the opinion") (citing *Robinson v. Sullivan*, 956 F.2d 836, 841 (8th Cir. 1992)). Here, because Plaintiff's grandmother's report mimics Plaintiff's own allegations, the ALJ's supported finding that Plaintiff's allegations are not entirely credible extends to her grandmother's allegations as well.

The ALJ articulated the inconsistencies on which she relied in discrediting Plaintiff's subjective complaints. That finding is supported by substantial evidence.

### 1. Developing the Record

Plaintiff argues that the ALJ should have more fully developed the record regarding her claims. Plaintiff argues that "if the ALJ actually questioned the veracity of plaintiff's impairments and limitations, she should have obtained the medical records from Children's Mercy." (Pl.'s Br. at 31.) The duty to "fully and fairly develop the record" concerning Plaintiff's limitations only exists if "the ALJ did not believe that the professional opinions available ... were sufficient to allow [her] to form an opinion." *Tellez v. Barnhart*, 403 F.3d

953, 956-57 (8th Cir. 2005). Here, the evidence was sufficient to allow the ALJ to form an opinion discrediting Plaintiff's subjective testimony.

Though Plaintiff also argues that the ALJ should have more fully developed the record regarding her mental impairments, she did not list anxiety as an impairment on her disability application and did not testify to any mental difficulties beyond anxiety while driving. Plaintiff's attorney did not request that the ALJ further develop Plaintiff's mental problems, nor did he request that the ALJ hold the record open so that the attorney could do so. The ALJ is under no "obligation to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability." *See Pena v. Chater*, 76 F.3d 906, 909 (8th Cir. 1996); *see also* 20 C.F.R. § 416.912.

It is Plaintiff's responsibility to provide medical evidence to show she is disabled. *See* 20 C.F.R. § 416.912. The ALJ was not required to further develop the record.

**C.      RFC**

Plaintiff briefly argues that the ALJ erred in her RFC determination. However, Plaintiff cites to no objective evidence contradicting that determination. It is the ALJ's responsibility to determine RFC based on all the relevant evidence, including medical records, observations of treating physicians and others, and the claimant's description of her limitations. See 20 C.F.R. § 416.945; *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006). Here, the ALJ found that Plaintiff had the capacity to perform the full range of light unskilled work.

The ALJ's determination of Plaintiff's physical limitations is supported by substantial evidence. The ALJ specifically cited medical evidence: this included the medical expert's testimony, which the ALJ noted is supported by the opinion of the State agency medical consultant. *See Casey v. Astrue*, 503 F.3d 687, 694 (8th Cir. 2007) ("The ALJ did not err in considering the opinion of [the State agency medical consultant] along with the medical evidence as a whole.").

The ALJ's mental RFC determination is also supported by substantial evidence. The ALJ determined Plaintiff's non-severe depression and anxiety resulted in mild limitations in activities of daily living; mild difficulties maintaining social functioning; mild difficulties maintaining concentration, persistence, or pace; and no periods of decompensation of extended duration. The ALJ's mental RFC determination is supported by the opinion of the State agency psychiatric consultant, who – after review of the medical evidence of record – determined that Plaintiff's anxiety and depression were not severe.

The ALJ also noted the absence of contrary medical evidence indicating that Plaintiff is mentally or physically disabled. The ALJ's RFC determinations are supported by the substantial weight of the evidence.

**D.    The Vocational Expert**

The ALJ was entitled to rely on the vocational expert in determining that Plaintiff could perform jobs existing in significant numbers in the economy. *See Guilliams v. Barnhart*, 393 F.3d 798, 804 (8th Cir.2005) (stating that ALJ was entitled to rely on response of vocational expert to properly-formulated hypothetical question). The ALJ's hypothetical

23

questions to the vocational expert were based on her RFC findings, including those limitations she appropriately found credible. "Because the vocational expert was presented with a proper hypothetical, [the vocational expert's] testimony that there were significant numbers of jobs that [Plaintiff] could perform despite [her] limitations constitutes substantial evidence supporting the ALJ's determination that [Plaintiff] was not disabled." *Pertuis v. Apfel*, 152 F.3d 1006, 1007(8th Cir. 1998) (indicating that hypothetical questions need only include limitations found credible by ALJ).

## III.   Conclusion

The ALJ's decision is supported by substantial evidence. Accordingly, it is hereby ORDERED that Plaintiff's petition [Doc. # 4] is DENIED.


s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  November 17, 2009
Jefferson City, Missouri